UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

OLD CANTON ROAD APARTMENTS, LTD.                                         PLAINTIFF

V.                                            CIVIL ACTION NO. 3:20-CV-797-DPJ-FKB

TOPVALCO, INC., ET AL.                                                  DEFENDANTS

ORDER

Plaintiff Old Canton Road Apartments, Ltd. (OCRA) claims that Defendants altered the natural drainage patterns on their property, thereby flooding OCRA's adjacent apartment complex. The parties have filed dueling summary-judgment motions and motions to exclude expert testimony, and Defendants filed a motion to strike an additional expert's affidavit. As explained below, the Court takes the Motion to Strike [199] under advisement; Defendants' Motion to Exclude Opinions of Charles Smithers [150] is denied; Plaintiff's Motion to Exclude Testimony of Powell Ogletree [184] is granted in part and denied in part; and both summary-judgment motions [148, 186] are denied.

I.      Factual Background and Procedural History

Since 1992, OCRA has owned and operated the Canton Manor apartment complex located on Old Canton Road in Jackson, Mississippi. Since 2016, Defendant Topvalco, Inc., has owned all but a small portion of the Jacksonian Plaza Shopping Center in Jackson, Mississippi.[1] Jacksonian Plaza houses a grocery store operated by Defendant The Kroger Co., as well as other retail businesses including Books-A-Million and Goodwill. The two properties are adjacent to one another, with Canton Manor lying to the east of Jacksonian Plaza; a fence runs north-and-

---

[1] The portion of the parcel Topvalco does not own is not relevant to the parties' dispute.

south along the line where the two properties meet.  Hanging Moss Creek abuts the north end of both properties:



Butler Report [148-3] at 3.

Generally speaking, Jacksonian Plaza sits at a slightly higher overall elevation than Canton Manor, with a low area existing at and on both sides of the property line that is "larger and deeper on the apartment complex side."  *Id.* at 10.  Before the properties were developed, "[a] tributary or meander of Hanging Moss Creek [existed] at or near the same location as the area of lowest elevation within the apartment complex property . . . near the common property boundary of the two developments."  *Id.* at 3.  That meander can be seen on a 1963 topographic map:



*Id.* at 8. The current "northeasterly trend" of "the ground elevations in the vicinity of the shared storm drain and easement" "follow[] the same drainage pattern as the old tributary valley/meander seen on . . . historic aerial photography." *Id.* at 9.

In 1964, the then owners of the two parcels at issue granted each other five-foot-wide easements on their respective sides of the boundary between the properties, creating a ten-foot easement "for utilities and drainage." Ogletree Report [148-8] at 25, June 30, 1964 Warranty Deed at 1. At some point thereafter, a city-owned storm drain was installed under the ground within the ten-foot easement area. The drain "extends the entire length of the [Canton Mart] property from south to north, along the west side of the property, with a typical diameter of at least 36 inches." McKay Report [148-5] at 5. Within a paved area on the Jacksonian Plaza side of the boundary between the properties, "[t]wo grate inlets . . . collect stormwater runoff . . . and carry it to the [c]ity-owned storm drain":

3



Butler Report [148-3] at 9.

In 2018, the Kroger store was remodeled, and the asphalt parking lot was milled and overlaid. According to OCRA, "[i]n early 2018, employees and tenants of Canton Manor Apartments noticed increased water drainage and flow from [the] Jacksonian Plaza property onto the Canton Manor Apartments property." Compl. [1-1] ¶ 10. OCRA says Defendants' maintenance of the Jacksonian Plaza property "caused changes to the volume and flow of the natural surface water," diverting more water onto OCRA's property and damaging a number of its buildings. Pl.'s Resp. [159] at 3.

OCRA filed this lawsuit in Hinds County Chancery Court on October 27, 2020, against Topvalco and Kroger (collectively "Kroger"), alleging that "the increase in water drainage and flow followed alterations made to the parking lot and property at Jackson Plaza." Compl. [1-1] ¶ 11. On that factual allegation, OCRA asserted claims for negligence and private nuisance and sought damages and injunctive relief.[2] Kroger removed the case to this Court.

---

[2] The Complaint also included a request for a preliminary injunction, but OCRA never pursued that request.

4

Following the close of discovery, the parties filed their cross motions for summary judgment and to exclude experts, and Kroger separately moved to strike an affidavit and expected trial testimony from one of OCRA's expert witnesses, Brandon McKay. All motions have been fully briefed, and subject-matter jurisdiction exists. The Court will take the McKay motion under advisement and resolve the rest.[3]

II.     *Daubert* Motions

    A.     Standard

The parties challenge each other's experts under Federal Rule of Evidence 702, invoking the Court's gatekeeper function. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 n.7 (1993). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. In other words, "[t]he Court must determine whether (1) the expert is qualified by special knowledge, (2) his opinion is relevant, and (3) [it] has a reliable basis." *Howell v. Imperial Palace of Miss., LLC*, No. 1:09-CV-7-LG-JMR, 2011 WL 13195946, at *1 (S.D. Miss. Jan. 11, 2011) (citing *Daubert*, 509 U.S. at 589).

---

[3] The Court defers ruling on the McKay motion because his affidavit affects neither dispositive motion. OCRA did not submit the affidavit in response to Kroger's summary-judgment motion and survives without it. And even if the Court considered the affidavit as support for OCRA's summary-judgment motion, Kroger has still created a material factual dispute. That said, Kroger also asks the Court to preclude McKay from testifying at trial regarding new opinions stated in his affidavit. The Court will set that issue for hearing on the same day as the pretrial conference.

Whether a proposed expert should be permitted to testify under Rule 702 "is case, and fact, specific." *Hodges v. Mack Trucks Inc.*, 474 F.3d 188, 194 (5th Cir. 2006).  And the decision to admit or exclude evidence is within the discretion of the trial court.  *Howell*, 2011 WL 13195946, at *1 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141–46 (1997)); *see Peters v. Five Star Marine Serv.*, 898 F.2d 448, 450 (5th Cir. 1990) (noting decision of trial judge to allow expert testimony "is given broad discretion and will only be reversed if the decision is manifestly erroneous").

B.     Kroger's Motion

Kroger asks the Court to exclude Charles Smithers's causation opinions.  Smithers is a licensed structural engineer who "was hired by OCRA to perform an inspection of the structural foundations of the affected apartment units."  Pl.'s Designation [150-1] at 5.  Kroger seeks to exclude Smithers's opinion that

> [t]he main culprit of water intrusion in the crawl spaces appears to be the offsite water entering the property during large storm events from the Kroger property to the west.  In fact, property management has video of this occurrence during heavy rain events.  According to property management, the water issues under the buildings were noticed shortly after Kroger resurfaced their parking lot.  We do not know the specifics of the resurfacing efforts and how it affected drainage of the asphalt lot, but it does appear that the parking lot elevation was raised to some extent based on observations at the catch basins.

Smithers Report [150-2] at 3–4.

Kroger first argues that OCRA failed to designate Smithers as a causation expert and that his report was untimely, but Judge Ball rejected those contentions in January of this year, and Kroger never appealed his ruling.  Order [202].  So that leaves the question whether the challenged opinion is "'based on sufficient facts or data' [or] 'the product of reliable principles and methods.'"  Defs.' Mem. [151] at 8 (quoting Fed. R. Evid. 702).  Kroger says it is not because "[t]he extent of Smithers'[s] investigation is the review of a video and self-serving

6

statements from Plaintiff's employees in formulation of his opinions, such that his opinions are invalid in their entirety." *Id.*; *see also* Defs.' Reply [163] at 2 ("Smithers engaged in no kind of investigation into possible sources of the water intrusion onto the apartment complex. He did not investigate the creek as a potential cause or blockages or inadequate drainage of the shared storm drain.").

In response, OCRA argues that "[a]s a structural engineer, Smithers is perfectly qualified to make a reasonable inference from his observations and the additional evidence for the purpose of providing assistance in fixing the source(s) of water intrusion." Pl.'s Resp. [156] at 3. And it observes "that viewing a video of the water flow in question" is a reliable way of assessing that flow. *Id.* Finally, it says Kroger's quibbles with Smithers's opinion go to its weight, not its admissibility.

Smithers is qualified to offer opinions within the area of his expertise. And his reliance on witnesses to the water flow and resulting damage is permissible, especially when he also considered video showing the water flow. *See Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 525 (5th Cir. 2013) (affirming admission of expert testimony based on employee interviews). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. The motion to exclude Smithers is denied.[4]

---

[4] The motion is denied without prejudice to the extent it challenges Smithers's opinion that "the parking lot elevation was raised to some extent." Smithers Report [150-2] at 4. Neither party directly examined this opinion, focusing instead on opinions regarding the water's source. The Court therefore lacks a sufficient basis to consider whether the elevation opinion survives Rule 702 and will address the issue at the pretrial conference.

C.     OCRA's Motion

OCRA asks the Court to exclude the testimony from Powell "Gee" Ogletree, Jr., Esq. Ogletree is an attorney who "specializes in the field of real estate" and "is expected to offer testimony relative to the real property issues existing between the parties, particularly the easements that exist on the properties owned respectively by each party, as well as the shared obligations of the two property owners." Defs.' Designation [184-1] at 3. OCRA says Ogletree's opinions are impermissible legal conclusions and he is not qualified to testify.

Starting with qualifications, Ogletree is qualified to provide expert testimony in the field of real-estate transactions. *See* Ogletree CV [184-3]. While OCRA wants to paint him as a forestry expert, Ogletree also has experience with "commercial and industrial transactions" and "real estate disputes involving zoning, title, easements, access, [and] water." *Id.* at 7. Ogletree is qualified as an expert in real-property issues.

But OCRA is correct that many of Ogletree's opinions venture into impermissible legal conclusions. For example, he plans to opine that Kroger, as the upper landowner, "can develop [its] property in a reasonable manner even if the development increases the flow of water and drainage onto the lower landowner." Ogletree Report [184-2] at 5. It is well-settled that "[e]xperts cannot 'render conclusions of law' or provide opinions on legal issues." *Renfroe v. Parker*, 974 F.3d 594, 598 (5th Cir. 2020). "[A]llowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant." *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). And interpreting the law for the jury is left to the judge. *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997). Otherwise, "the jury would be very susceptible to adopting the expert's conclusion," and "each party would find an expert who would state the law in the light most favorable to its position."

*Id.* (citing *Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988)). To the extent Ogletree intends to offer legal conclusions or instruct the jury on what the law means, OCRA's motion is granted, and the Court has not considered those opinions in assessing the summary-judgment motions.

That said, Ogletree's report also contains facts about which he is qualified to testify. For example, Ogletree explains the existence of the easements along the property line based on his review of a policy of title insurance. Ogletree Report [184-2] at 2. These factual matters are relevant and within Ogletree's area of expertise, and his testimony as to facts in issue is admissible. *See Askanase*, 130 F.3d at 672 ("Lawyers may testify as to legal matters when those matters involve questions of fact."). OCRA's motion as to Ogletree is therefore granted in part and denied in part.[5]

III. Summary-Judgment Motions

    A.    Standard

Summary judgment is warranted under Federal Rule of Civil Procedure 56(a) when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion[] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The

---

[5] Based on the briefing, this ruling establishes parameters rather than an opinion-by-opinion ruling on Ogletree's report. This issue will be addressed at the pretrial conference.

nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (citation omitted). Thus, "the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010) (citations omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A) (stating that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record"). And the Court "need consider only the cited materials." *Id.* R. 56(c)(3).[6]

As for the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little*, 37 F.3d at 1075; *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993).

B.   Analysis

OCRA alleges negligence and a private-nuisance theory premised on unintentional conduct. To prevail on either claim, OCRA must establish that Kroger's negligence caused its

---

[6] The Court must note that OCRA frequently cites its own statement of undisputed facts to support factual allegations in its briefs without ever citing the particular parts of the record supporting those allegations. That practice fails to satisfy Rule 56(c)(1)(A), and the Court has not considered unsupported factual assertions.

damages. "An entity is subject to liability for a private nuisance only when its conduct is a legal cause of an invasion of another's interest in the private use of enjoyment of land and that invasion is . . . unintentional but otherwise provides the basis for a cause of action for negligent . . . conduct . . . ." *Biglane v. Under The Hill Corp.*, 949 So. 2d 9, 14 (Miss. 2007).

The elements of negligence are familiar: "duty, breach, proximate causation, and damages." *Hardin v. Town of Leakesville*, 345 So. 2d 557, 565 (Miss. 2022) (quoting *Simpson v. Boyd*, 880 So. 2d 1047, 1050 (Miss. 2004)). But Mississippi law has developed special rules regarding the duties an upper landowner (Kroger) owes a neighboring landowner (OCRA) with respect to surface waters. Informing these rules is the fact that "[w]aters obey only the laws of physics, principal of which are the laws of gravity." *Hall v. Wood*, 443 So. 2d 834, 838 (Miss. 1983). To that end,

> [e]ach landowner takes his lands—and their waters—as he finds them, burdens and benefits alike. Where the flow of waters has been rendered by the operation of the laws of physics upon the natural contours of the land, a lower landowner has no rights against his upper neighbor for damages thus caused. Certainly upper landowners may use well established watercourses through lower lands to drain upper properties. On the other hand, an upper landowner may not unreasonably alter natural drainage patterns to the detriment of his lower neighbor.

*Id.* at 838–39 (citations omitted). So,

> [a]n upper landowner may increase the flow of water via drainage incident to the reasonable development of his property even though it does some damage to the lower landowner. Water by its nature confers burdens as well as benefits. These burdens our law requires be shared equitably.
>
> From the vantage point of the owner of lower lands, the law is complementary. In diverting waters from his lands, any landowner must use reasonable care to prevent unnecessary injury to adjoining landowners. The owner of upper lands does not have the right to collect and discharge waters onto the lower landowner with impunity even though in some instances in no greater overall quantity than flowed from his property in its natural state. Numerous cases have held that upper landowners may not by artificial means discharge waters in greater quantities to the detriment of lower landowners.

11

*Id.* at 839–40 (citations omitted).  Under these standards, both OCRA and Kroger say they are entitled to summary judgment.

OCRA's motion for summary judgment is easily denied; Kroger presents credible record evidence—largely through expert testimony—creating a jury question whether it altered the drainage from its property in a way that contributed to the flooding OCRA experienced.  On this record, whether Kroger acted reasonably is for the jury.  *See Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1126 (5th Cir. 1978) (noting that "juries determine issues of negligence").

Kroger's dispositive motion is far more difficult to assess, and the Court has consumed considerable resources considering it.  OCRA hopes to establish Kroger's fault through circumstantial evidence.  Circumstantial evidence is certainly acceptable, but it has limits.  "[N]egligence may be proved by circumstantial evidence where the circumstances are such as to remove the case from the realm of conjecture and place it within the field of legitimate inference."  *Hardin*, 345 So. 3d at 566 (Miss. 2022) (quoting *Kussman v. V & G Welding Supply, Inc.*, 585 So. 2d 700, 703 (Miss. 1991)).

According to Kroger, "the only proof before this Court is that the flood events placed at issue by Plaintiff are, 'directly associated with Hanging Moss Creek, from either bank overflowing or backing up through connecting storm drains.'"  Defs.' Resp. to Pl.'s Statement of Undisputed Material Facts [189-1] ¶ 21 (citing Butler Report [148-3] at 28).  But viewed in the light most favorable to OCRA, the jury could conclude that water flowing from Jacksonian Plaza contributed to flooding at the apartment complex.

For example, after OCRA complained about flooding in 2018, Kroger's property manager, Tracy Sexton, sent several internal emails addressing drainage issues with attached videos:

> You can see from the [first] video the amount of water that is coming off of the parking lot behind Goodwill and going under the fence to the apartment complex. The [second] video shows the flow of the water. The [third] video is of the parking lot that has not yet been paved and the area where it is ponding.

Sept. 26, 2018 Sexton Email [186-3] at 1. Based on this and other similar evidence, a jury could find that water from Kroger's property flowed onto OCRA's property, and OCRA has offered other evidence of resulting damage.

Whether Kroger's actions caused that flooding is another question for the jury. To begin, Kroger admits that it removed all asphalt in the Jacksonian Plaza in 2018 and that the back loading area was not resurfaced until 2019. Kroger Response to Pl.'s Statement of Material Fact [189-1] ¶¶ 30, 31; *see also* Pl.'s Statement of Material Fact [186-1] ¶¶ 30, 31. It also replaced existing gutters during this same period and made other alterations.

According to OCRA manager Donna Smith, water started intruding the apartment complex after the re-paving project began. Smith Dep. [148-2] at 13–14. Before that, she had not noticed "water runoff from the parking lot onto the apartment property." *Id.* at 13. If the jury believes Smith's testimony, then it could conclude that the paving project diverted water to the apartment complex.

That theory finds additional support in Sexton's other emails addressing the drainage issues. For example, she wrote:

> My contractor Matt [Warren] just called me back and said that he has found an issue. He has been tracing the water flow and said that there is a major elevation difference of 6–8" or more from behind Kroger to behind the retail and a low spot in the pavement between Books-A-Million and Goodwill. There are no drains in this area. He did go over to the apartments and there is ponding water that is coming from the area behind [Books-A-Million] and Goodwill. He said this can be corrected once the paving contractor completes the work. They will either need to correct the low spot/elevation difference or install a 4" curb to divert the water to the creek. He said the area is over 100 yards from the closest drain.

Sept. 26, 2018 Sexton Email [186-5] at 3.

13

It remains unclear when this elevation change occurred, but Smith's testimony creates a question whether the milling and paving project caused the conditions leading to the flooding. Smith Dep. [148-2] at 13–14.  And other circumstantial evidence indicates that an elevation difference may have existed where the work was unfinished.  *See* Sept. 26, 2018 Sexton Email [186-5] at 3 (noting unfinished area of paving project where water was "ponding").  Smithers also reported that the "parking lot elevation was raised to some extent based on observations at the catch basins," though the Court need not rely on that opinion to reach the same result. Smithers Report [150-2] at 3–4.

In addition, OCRA has offered evidence of other alterations that occurred around the time that Smith first noticed flooding.  Some of those arguments are not overly compelling, and the Court recognizes Kroger's positions as to them.  But at this stage, the Court must view the evidence in the light most favorable to OCRA—without weighing it.  In that light, OCRA has offered enough to create a jury question whether Kroger "alter[ed] natural drainage patterns to [OCRA's] detriment."  *Hall*, 443 So. 2d at 838.  And there is enough evidence to allow the jury to decide whether Kroger acted unreasonably in doing so.  *Nunez*, 572 F.2d at 1126.

As a final note, the Fifth Circuit has repeatedly recognized that "[e]ven if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'the better course would be to proceed to a full trial.'"  *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 538 (5th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)); *accord Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994); *Veillon v. Expl. Servs.*, 876 F.2d 1197, 1200 (5th Cir. 1989).  On this record, the Court concludes that the better course would be to take OCRA's claims to trial.

IV.     Conclusion

The Court has considered all arguments. Those not directly addressed would not have changed the outcome. For the foregoing reasons, Defendants' Motion to Strike [199] is taken under advisement; Defendants' Motion to Exclude Opinions of Charles Smithers [150] is denied; Plaintiff's Motion to Exclude Testimony of Powell Ogletree [184] is granted in part and denied in part; Defendants' Motion for Summary Judgment [148] is denied; and Plaintiff's Motion for Summary Judgment [186] is denied. This case is presently set for an April 14, 2023 pretrial conference. The parties are instructed to contact Courtroom Deputy Shone Powell within one week of this Order to set the time of the pretrial conference. The parties are further ordered to review and fully comply with Uniform Local Rule 16(j) and all instructions in any notices of pretrial conference.

**SO ORDERED AND ADJUDGED** this the 20th day of March, 2023.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE