UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

OLD CANTON ROAD APARTMENTS, LTD.                               PLAINTIFF

V.                                    CIVIL ACTION NO. 3:20-CV-797-DPJ-FKB

TOPVALCO, INC., ET AL.                                         DEFENDANTS

ORDER

Plaintiff Old Canton Road Apartments, Ltd. (OCRA) claims that Defendants (hereinafter

Kroger) altered the natural drainage patterns on their property, thereby flooding OCRA's

adjacent apartment complex during heavy rain.  The Court explained the facts and procedural

history in a March 20, 2023 Order [208] and incorporates that discussion here.  This Order

addresses Kroger's five motions in limine [211, 213, 215, 217, 219], its motion to strike opinions

from an OCRA expert [199], and OCRA's motion to strike Kroger's four expert supplements

[236].

I.      Motions in Limine

A motion in limine is a motion made prior to trial for the purpose of prohibiting
opposing counsel from mentioning the existence of, alluding to, or offering
evidence on matters so highly prejudicial to the moving party that a timely motion
to strike or an instruction by the court to the jury to disregard the offending matter
cannot overcome its prejudicial influence on the jurors' minds.

*O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1306 n.1 (5th Cir. 1977) (citation and quotation marks

omitted).  As with all in limine orders, the non-prevailing party may revisit the issue at trial

outside the jury's presence.  *See Jackson-Hall v. Moss Point Sch. Dist.*, No. 3:11-CV-42-DPJ-

FKB, 2012 WL 1098524, at *4 (S.D. Miss. Apr. 2, 2012).

A.      Kroger's Motion Regarding Improper and Undisclosed Evidence [211]

Kroger seeks an order excluding evidence or argument related to two categories of

damages:  lost rental income and tree-trimming expenses.  According to Kroger, OCRA never

produced evidence related to these damages in its pre-discovery disclosures or discovery responses.  Federal Rule of Civil Procedure 37(c)(1) provides that

> [i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

OCRA appears to abandon its claim for tree-trimming expenses, so that much is granted. *See* Pl.'s Mem. [229] at 5.  Regarding rent, OCRA stated in discovery that it would seek those damages and quantified them.  So the question is whether it may use never-produced exhibits to support those damages.  OCRA never directly addresses that finer point, arguing instead that Kroger's motion in limine is a motion for summary judgment in disguise.  It supports that position with *Johnson v. Aarons, Inc.*, where the district court concluded that motions in limine may not replace summary judgment.  *See id.* at 3 (citing No. 2:17-CV-137-KS-MTP, 2019 WL 5847886, at *2 (S.D. Miss. July 3, 2019)).

OCRA is correct if Kroger is trying to block all evidence related to lost rents; Kroger should have asserted any dispositive motions within the deadlines.  But *Johnson* goes only so far. The plaintiff there was not trying to offer new evidence, and District Judge Keith Starrett specifically noted that "[s]hould Plaintiffs . . . produce[] documentary evidence that has never been disclosed, Defendant may object contemporaneously and seek to exclude such evidence under Rule 37(c)(1)."  2019 WL 5847886, at * 2.  OCRA has not explained why it should be allowed to use never-produced exhibits (assuming there are any).  For this reason, Kroger's motion is granted as to the tree-trimming claim and as to documents that have not been produced.  It is otherwise denied.

B.      Kroger's General Motion [213]

1.      Items Not Produced in Discovery

Kroger's general motion in limine overlaps its first motion, asking the Court to preclude exhibits, experts, and witnesses OCRA failed to disclose during discovery or through pre-discovery disclosures.  As noted, Rule 37(c) precludes a party from using evidence it failed to produce.  The Court discussed the issue with the parties during the pretrial conference, and it does not appear that OCRA intends to offer never-produced evidence.  If either party tries to offer such evidence at trial, they must first raise the issue outside the jury's presence.[1]

2.      Existence of Flooding

During a deposition, an OCRA witness said there had been flooding from Kroger's property "every time it rains."  Smith Dep. [148-2] at 15.  After that testimony, Kroger sent letters to OCRA each time it rained, asking for proof of flooding.  Letters [214-1].  OCRA apparently ignored the correspondence, so Kroger now argues that OCRA should be precluded from saying it floods from Kroger with every rain.

To begin, OCRA was under no duty to respond to letters from counsel.  In any event, this appears to be an argument over semantics that goes to weight.  If OCRA argues that it floods every time it rains and fails to prove it, then Kroger will let the jury know.  The issue is not so prejudicial that it cannot be handled in the normal course of trial.  The motion is denied.

---

[1] OCRA argued in response to this and other motions that there is no duty to disclose rebuttal or impeachment evidence or list it in the pretrial order.  *See, e.g.*, Pl.'s Mem. [227] at 3.  But the terms "impeachment" and "rebuttal" are limited and would not forgive the failure to disclose evidence addressing expected issues at trial.  *See Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 517–18 (5th Cir. 1993); *Morgan v. Com. Union Assur. Cos.*, 606 F.2d 554, 555–56 (5th Cir. 1979).

### 3.      Golden Rule

Kroger hopes to preclude "any argument and/or comment asking, directing, or in any way encouraging jurors to place themselves in the position of the Plaintiff in this cause for any purpose." Def.'s Mem. [214] at 4.  To support that position, Kroger cites a 1965 case from the Mississippi Supreme Court.  *See Danner v. Mid-State Paving Co.*, 173 So. 2d 608, 612 (Miss. 1965) ("[I]t is improper to permit an attorney to tell the jury to put themselves in the shoes of one of the parties or to apply the Golden Rule.").  Kroger's motion is overly broad and misstates the federal standard:

> The use of the Golden Rule argument is improper only in relation to damages.  It is not improper when urged on the issue of ultimate liability.  *Burrage v. Harrell*, 537 F.2d 837 (5th Cir. 1976).  The two objected-to uses of the Golden Rule argument requested the jury to put themselves in Stokes' place to determine whether his fears and resultant failure to request help were reasonable.  This determination went to the ultimate question of liability, not the amount of damage.

*Stokes v. Delcambre*, 710 F.2d 1120, 1128 (5th Cir. 1983).  The motion is therefore granted to the extent that it relates to damages and denied regarding liability issues.

### 4.      Motions in Limine

Relying on Mississippi law, Kroger says OCRA should be precluded from referencing Kroger's motions in limine.  Kroger explained during the pretrial conference that it is not trying to prevent OCRA from making a general objection based on the Court's in limine rulings but fears OCRA would discuss evidence the Court excluded or the substance of the evidentiary motions.  The former would violate the Court's orders, and the latter would be irrelevant and prejudicial.  The motion is therefore granted as limited during the pretrial conference.

### 5.      Evidence of Liability Insurance

OCRA concedes this issue, so Kroger's motion is granted.

6.    Lay-Witness Causation Opinions

Kroger hopes to exclude OCRA witnesses Johnny Owsley and David Burns from offering causation opinions.  Owsley and Burns worked as appraisers for Southeast Appraisals, a service OCRA retained to assess the market value of its apartments as part of its damages case.  Pl.'s Suppl. Resp. [247] at 1–2 (quoting Designation [143-1] at 4–5).  Kroger takes no issue with the admissibility of those appraisals but objects to any opinions addressing causation.  *See* Def.'s Suppl. Mem. [252] at 2.

While it is unclear if Owsley and Burns intended to offer causation opinions, the issue arose during their depositions.  Owsley testified:

> A.    It's coming in to the—near where the building that suffered the damage.  Apparently, that's a low point on the Kroger property because that's where all the water flows to from the parking lot.  That's—apparently, that's the reason they put two catch basins over there, to drain the water when the parking lot floods.  But since they don't, apparently, keep the drainage catch basins, the grates, uncovered, that hampers the water flowing down into the water sewer, storm sewer.
>
> Q.    Okay.  And do you have any knowledge about the Hanging Moss Creek that's right there and the drainage system that's connected to it, whether there are any blockages or anything of that nature?
>
> A.    I didn't—I didn't notice any blockages in the creek when I was there that day, but, I wasn't, you know . . .
>
> Q.    Did you observe the creek that day?
>
> A.    I looked at it briefly.  It's on one end—it's on the—one end of the property line.  But to my knowledge, I don't think the buildings themselves have suffered any flooding from that creek.
>
> Q.    Okay.
>
> A.    So they should be—they should be—let's say this.  The buildings should be above flood zone elevations.
>
> Q.    And what are you basing that on?

A.      The flood map.

Q.      Okay.  So you reviewed a flood map?

A.      Yeah.  We have a flood map in the report.

Q.      Okay.  Well, do you know what water levels it would take to flood those buildings?

A.      No, I do not, but that—no.  That's all I can say.  The rest of it would be determined by an engineer.

Q.      And, now, you looked at one engineer's report, or someone with the company looked at Mr. Smithers' report.  Is that right?

A.      Yes, ma'am.

Q.      Okay.  And have you looked at any other engineering reports in this case?

A.      No, I have not.

Q.      Okay.  If there were other reports from engineers, would it be important for you to review those in coming to your appraisal conclusion?

A.      No, because our scope of work was to determine what value the apartments have been harmed by the water damage, by the loss—by the loss of rents incurred by not being able to rent units over time.

**Q.      Okay.  So it wasn't necessarily within the scope of your work to try to determine what causes the water to flow onto the apartment complex?**

**A.      No, ma'am.**

Owsley Dep. [213-2] at 15–17 (emphasis added).  Burns gave similar testimony:

Q.      Now, in this portion from the Smithers report, it discusses sources of the water damage.  Are you personally able to testify as to what caused the water damage at the apartment complex?

A.      Only my opinion.

Q.      Only your opinion?

A.      Yes.

Q.      What would that opinion be based on?

A.      I think it's water off the side of Kroger.

Q.      Why do you think that?

A.      Because I'm finding a lot of water damage and that was the logical—that was the logical source of it.

Q.      Isn't the apartment complex right next to a creek, you said?

A.      The creek's on the other end of the project.

Q.      Okay.  But do you have any independent knowledge about when the creek could have flooded?

A.      We asked that question and found that it had had high water twice but flooding had never been an issue.

Q.      You asked that question to who?

A.      Ms. Avocato.

Q.      And Ms. Avocato told you that flooding from the creek had never been an issue?

A.      She told Mr. Owsley that.  He relayed it to me.

Q.      Have you ever personally observed water runoff from the Kroger parking lot to the apartment complex?

A.      No, ma'am.

Q.      To your knowledge, has Mr. Owsley ever observed it?

A.      No, ma'am.

Q.      Do you have any knowledge about the drainage pipes and the drainage system of the apartment complex?

A.      Of the apartment complex?

Q.      Yes, sir.

A.      No, ma'am.

Q.      Was that drainage system ever inspected during the appraisal process?

A.      I can't say that I did specifically.

Q.      So you would not be able to testify that that drainage system of the apartment complex is functioning properly?

A.      It appeared to be functioning fine to me.

Q.      So you did observe it?

A.      I'm sorry, I didn't hear.

Q.      So you said that it appeared to be functioning fine to you.  So did you observe the drainage system at any point?

A.      Ma'am, appraisers don't break down property into the various components.  What we do is we look at it like a market participant.  They're not going to go out there and dig up the drainage system or go up under those buildings and look at the drain system.  They're not going along the edges.  They're going to cut the water on, if it runs, it's great.  If they flush the toilet and it flushes, that's fine.  That's what I did.

Q.      Okay.  That's fine.  I'm just asking you what you observed and—and what you did not observe and how it might have affected your report.

A.      I saw, you know, no obvious problem with the drainage other than the washout we was getting on a couple of the buildings, and it appeared to me the water was coming from the Kroger parking lot.

Burns Dep. [213-3] at 19–21.

OCRA argues that the jury should hear this testimony because it reflects (1) expert testimony relevant to the witnesses' appraisals and (2) layperson opinions based on their "expertise, observations, and rational conclusions."  Pl.'s Suppl. Resp. [247] at 14.

a.      Expert Testimony

Whether Owsley and Burns may testify as causation experts starts with Federal Rule of Civil Procedure 26(a).  OCRA designated the two as experts under Rule 26(a)(2)(C).  *See* Pl.'s Designation [143-1] at 3–4.  Under that rule, disclosures must state:  "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify."  Fed. R. Civ. P. 26(a)(2)(C).  As to each witness, OCRA stated that they were "expected to testify

as to the market value of Canton Manor Apartments in its current state and his estimation of its market value if the apartment units affected by the water intrusion were able to be rented."  Pl.'s Designation [143-1] at 4.

Neither designation mentioned causation nor cited causation as being relevant to the witnesses' appraisals.  *Id.*  And under Rule 37(c)(1), "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."  OCRA failed to designate these witnesses as causation experts or disclose causation-related opinions. Nor has it demonstrated that the omission was substantially justified or harmless.

Even ignoring this deficiency, the witnesses would not survive the Rule 702 challenges Kroger asserts.  While OCRA touts Owsley's and Burns's expertise as appraisers, *see* Pl.'s Suppl. Resp. [247] at 9, no one disputes that.  The question is whether they possess sufficient "knowledge, skill, experience, training, or education" to offer expert causation opinions.  Fed. R. Evid. 702.  Owsley essentially acknowledged his lack of expertise in that area.  Owsley Dep. [213-2] at 16 (deferring to engineers on causation issues).  And OCRA has not shown that either would qualify as an expert on causation.

Even if qualified and properly designated, the opinions are unreliable.  Neither witness conducted any testing or investigation into causation, and Owsley testified that causation was not "within the scope of [their] work."  *Id.* at 17.  When Burns was asked for the basis of his causation opinions, he said he found "a lot of water damage and . . . that [Kroger] was the logical source of it."  Burns Dep. [213-3] at 19.  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999)

(quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144 (1997)).  And nothing in the record reveals reliable causation opinions—probably because the witnesses did not think they were hired to assess causation.

Owsley and Burns did read a report from Charles Smithers, an engineer OCRA retained and designated.  Kroger is concerned that OCRA may attempt to backdoor Smithers's opinions through Owsley and Burns.  Under Rule 703,

> [a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

But Owsley testified that he would not have reasonably relied on causation reports like Smithers's when forming the valuation opinions he and Burns were hired to provide.  Owsley Dep. [213-2] at 17.  That testimony undermines the argument that the causation opinions are relevant to the appraisal opinions.

As for Burns, OCRA says he did not have to rely on Smithers's report but that "it supported what Burns already thought."  Pl.'s Suppl. Resp. [247] at 9.  If OCRA is referring to Burns's thoughts on causation, then Rule 703 would not apply because Burns lacks causation expertise, and "[m]erely parroting the opinions of others stretches the boundaries of Rule 703 of the Federal Rules of Evidence which allows expert reliance on 'facts and data.'"  *S.W. v. United States*, No. 3:10-CV-502-DPJ-FKB, 2013 WL 1342763, at *5 (S.D. Miss. Apr. 2, 2013).  In sum, neither Owsley nor Burns may offer expert opinions beyond the scope of their expert designations.

### b.      Layperson Testimony

OCRA's fallback position asserts that if Owsley and Burns are not experts, then they should be allowed to offer layperson causation opinions.  Under Rule 701, a nonexpert may offer

opinions that are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." "[T]he witness must have personalized knowledge of the facts underlying the opinion and the opinion must have a rational connection to those facts." *Miss. Chem. Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 373 (5th Cir. 2002) (citing *Robinson v. Bump*, 894 F.2d 758, 763 (5th Cir.), *cert. denied*, 498 U.S. 823 (1990)).

As an initial point, Owsley and Burns are qualified to provide testimony about their personal observations when touring the property, like the existence of water damage.  They may also cite other evidence related to their expert appraisals if that evidence satisfies Rule 703.  But on this record, they may not offer lay causation opinions under Rule 701.

As OCRA notes in its brief, layperson opinions must be based on "personalized knowledge of the facts underlying the opinion."  Pl.'s Suppl. Resp. [247] at 11 (quoting *Walker v. Target Corp.*, No. 2:16-CV-42-KS-MTP, 2017 WL 2987282, at *5 (S.D. Miss. July 12, 2017)).  Yet both witnesses relied on third-hand information.  *See, e.g.*, Burns Dep. [213-3] at 20 (stating that he received information from Owsley that Owsley received from another witness). The "Court will not admit 'hearsay and speculation' masquerading as adequately supported lay opinion testimony."  *Flowers v. Sessions*, No. 2:17-CV-118-KS-MTP, 2019 WL 1560462, at *3 (S.D. Miss. Apr. 10, 2019) (quoting *Vance v. N. Panola Sch. Dist.*, 189 F.3d 470, 1999 WL 548772, at *1 (5th Cir. 1999)).

OCRA faces another problem under Rule 701.

[A] witness may offer lay opinion testimony when "it has the effect of describing something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event."  *United States v. Haines*, 803 F.3d

> 713, 733 (5th Cir. 2015) (cleaned up).  By contrast, a witness's "[t]estimony on
> topics that the jury is fully capable of determining for itself is not 'helpful to
> clearly understanding the witness's testimony,' and therefore is inadmissible
> under Rule 701."  *Id.* (citing, quoting Fed. R. Evid. 701).

*United States v. Hill*, 63 F.4th 335, 355 (5th Cir. 2023).  Here, for example, Owsley appears to have drawn some conclusions by watching videos of water events.  Owsley Dep. [213-2] at 10–11.  If his conclusions from those videos are based on his expertise, then they were never disclosed.  If he offers lay-witness opinions based on the videos (without relying on any expertise), then the jury is just as capable of watching the same videos and drawing its own conclusions.

The Court expects that laypersons will testify about the source of water at the apartment complex based on those witnesses' personal observations.  But Owsley and Burns are trying to extrapolate causation from what others told them and the damage they observed.  That stretches Rule 701 too far, and there is a legitimate risk of prejudice because the witnesses will otherwise testify as experts.  Kroger's motion is granted as to causation opinions from Owsley and Burns.

7.      References to Settlement Offers and Offers of Judgment

OCRA concedes this issue, so Kroger's motion is granted.

8.      Appeals to the Conscience of the Community/Sending a Message

Kroger seeks an order precluding any pleas to the "conscience of the community" or requests that the jury "send . . . a message."  Def.'s Mem. [214] at 6 (citing Fed. R. Evid. 401–403).  OCRA intends no such arguments but says the motion is overly broad and such issues can be addressed at trial.  Pl.'s Mem. [227] at 10.  While the motion is somewhat broad, such pleas are improper and prejudicial.  *Learmonth v. Sears, Roebuck & Co.*, 631 F.3d 724, 732 (5th Cir. 2011).  The motion is therefore granted.

9.      References to Claims for Punitive Damages or Attempts to Punish

Kroger asks the Court to exclude evidence related to punitive damages in the liability

phase of the case.  Def.'s Mem. [214] at 6.  Under Mississippi Code section 11-1-65, liability and

punitive damages are bifurcated.  The Court grants Kroger's motion.

10.     Corporate Profits

The parties at first disputed whether OCRA may offer evidence of Kroger's financial

strength during the liability phase.  That issue has been resolved, and the parties will present a

proposed stipulation.  The motion is granted.

11.     Adverse-Inference Argument Regarding Equally Available Witnesses

Kroger next says the Court should preclude OCRA from making adverse-inference

arguments about uncalled witnesses.  "[A] party's failure to call available witnesses . . . that

would clarify or explain disputed factual issues can give rise to a presumption that the evidence,

if produced, would be unfavorable to that party."  *United States v. Wilson*, 322 F.3d 353, 363

(5th Cir. 2003).  "There is, however, an important exception to the applicability of the

presumption:  if the witness is 'equally available' to both parties, any negative inference from

one party's failure to call that witness is impermissible."  *Id.* at 353 n.14 (quoting *McClanahan v.

United States*, 230 F.2d 919, 925 (5th Cir. 1956)).

"For the presumption to apply, the missing witness must have 'some sort of connection to

the party, such that one would expect that the missing witness's testimony would corroborate

that party's theory of the case, such as a party's employee or attorney whose legal advice was at

issue.'"  *Wallner v. Ziegler*, 470 F. App'x 230, 232 (5th Cir. 2012) (quoting *United States v.

Santos*, 589 F.3d 759, 764 (5th Cir. 2009)).  The Fifth Circuit has also stated that a witness is not

13

"equally available" if he or she is "controlled by one party" and the testimony "would elucidate facts in issue." *United States v. Chapman*, 435 F.2d 1245, 1247 (5th Cir. 1970).

Based on that authority, some missing witnesses might justify an inference and others might not. Neither party has identified a missing witness, and without knowing that, the Court cannot grant this portion of the motion.

> 12. Spoliation of Evidence

Kroger contends that OCRA should be precluded from suggesting spoliation of evidence but offers no legal analysis; OCRA says the motion is too vague. Whether Kroger destroyed relevant evidence might be admissible. For example, it could explain the lack of key evidence or become relevant and "admissible under the well-known consciousness-of-guilt theory." *Gipson v. Mgmt. & Training Corp.*, No. 3:16-CV-624-DPJ-FKB, 2018 WL 736265, at *7 (S.D. Miss. Feb. 6, 2018) (citing *United States v. Jones*, 873 F.3d 482, 498 (5th Cir. 2017) (affirming admission of evidence showing "consciousness of guilt")). OCRA should not be precluded from exploring this issue if it has a good-faith basis for doing so. Whether it is entitled to an inference instruction will be decided at the charge conference. The motion is denied.

> 13. Stipulations

Without argument, Kroger asks the Court to exclude "[a]ny request or attempt to secure from Kroger, its counsel, or any other witness any document, stipulation, or agreement in the presence of the jury." Def.'s Mem. [214] at 8. The motion is overly broad and vague and addresses issues that are not prejudicial enough to warrant an in limine ruling. The motion is denied.

C.      Kroger's Motion Regarding Evidence of Duties to Easements [215]

Kroger hopes to block OCRA from making factual statements that conflict with the

parties' legal duties (for example, referring to the storm drains as "Kroger's drains," or

suggesting that Kroger was at fault for allowing a third drain to disappear).  Def.'s Mem. [216] at

1.  As discussed during the pretrial conference, the Court will give the jury substantive

preliminary instructions on the parties' duties under existing easements and Mississippi law.

Any arguments or comments inconsistent with those instructions would be improper, irrelevant,

and prejudicial.  Kroger's motion is granted to that extent.  If the scope of this ruling remains

unclear after the instructions are read, the issue can be revisited away from the jury.

D.      Kroger's Motion Regarding Drainage Systems and Modifications Thereto [217]

      1.      References to Kroger Modifying or Altering its Roof, Gutters, or
            Downspouts

There is no dispute Kroger modified or altered its roof and gutters.  But Kroger says there

is no evidence this changed the water flow during the relevant time.  How the water flowed from

Kroger's property is relevant and not unduly prejudicial.  And whether Kroger altered the water

flow is a core question of fact for the jury.  The Court will not issue a blanket order precluding

OCRA from exploring those issues at trial.

      2.      Arguments Implying that Kroger Modified "Its" Storm Drain or Owned or
            Installed the 8-Inch Pipe Tying into the South Storm Drain

These two subjects revisit the issues Kroger raised in Motion [215], again contending that

OCRA may not make references (like "Kroger's drain") that conflict with the parties' legal

duties.  Again, the Court will give preliminary instructions, and the parties' references must

conform to the duties described in those instructions.  The motion is granted to that extent.  If

Kroger intended to argue that OCRA could not offer evidence about Kroger's alleged conduct

related to these systems, then the motion is denied.  The Court will not enter a blanket order preventing OCRA from exploring Kroger's alleged conduct because the jury must decide what Kroger did and whether it acted unreasonably.

       3.     Arguments that Kroger Acted Unreasonably by Increasing Lot Elevation

Kroger hopes to preclude OCRA from offering evidence related to OCRA's theory of the case.  While Kroger says no expert testimony supports the theory, it offers no legal authority suggesting that this issue requires expert testimony.  And if granted, the motion could be dispositive.  The Court will not issue a blanket prohibition on the reasonableness of Kroger's actions.

      E.     Kroger's Motion Regarding Upper Landowner's Standard of Care [219]

At its core, Kroger argues that "the Court should preclude OCRA from suggesting, arguing, or implying that Kroger be held to a standard of strict liability or any other such standard that exceeds the reasonableness standard of care established by Mississippi law." Def.'s Mem. [219] at 3.  That much is correct; an upper landowner's liability is not strict.  *See Hall v. Wood*, 443 So. 2d 834, 838 (Miss. 1983).  The Court will instruct the jury on this point, and OCRA may not pursue arguments or theories inconsistent with those instructions.

The Court also grants the motion to the extent that Kroger seeks to exclude evidence and argument that it acted intentionally to create a private nuisance.  Private nuisances can generally exist when a defendant acts intentionally or unreasonably.  *Leaf River Forest Prods., Inc. v. Ferguson*, 662 So. 2d 648, 662 (Miss. 1995).  In response to Kroger's summary-judgment motion, OCRA never tried to create a jury question under an intentional-conduct theory, arguing instead that "[s]ufficient evidence exists to establish Kroger's liability under the latter test," i.e., negligence.  Pl.'s Mem. [159] at 8.  In short, Kroger argued for dismissing the intentional-

conduct avenue for proving a private nuisance, and OCRA conceded the point by failing to address that theory in response.

III.     Expert Motions

The Court extended the expert disclosure deadline five times, giving the parties another nine months to finalize their opinions.  Still, both parties supplemented their expert reports after the final deadline, and they now move to strike each other's delinquent supplements.  Kroger got things started by moving to strike an affidavit by OCRA's expert Brandon McKay.  But it then supplemented its own expert Jill Butler—for the third time—just one day before the pretrial conference.  OCRA responded by moving to strike the latest Butler supplement and three others Kroger had filed about a year earlier.

As discussed below, it is too late to revisit Kroger's first three supplements, but the time has passed to supplement McKay's opinions or to again update Butler's report.  As both parties argued in their motions and during oral argument, allowing eleventh-hour supplements would cause prejudice and invite further delay in a case overdue for trial.

A.       Standards

Federal Rule of Civil Procedure 26(a)(2) governs expert disclosures.  A retained expert must, by the expert-disclosure deadline, provide a report that contains "a complete statement of all opinions the witness will express and the basis and reasons for them."  Fed. R. Civ. P. 26(a)(2)(B)(i) (emphasis added); *see* L.U. Civ. R. 26(a)(2) ("A party must make full and complete disclosure as required by [Rule] 26(a)(2) . . . no later than the time specified in the case management order . . . ." (emphasis added)).  The rules do, however, allow supplementation. Under Rule 26(e)(2), "any additions or changes to [the information included in the expert's

report] must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."  *Id.* R. 26(e)(2).

Timing is the key issue here, and under Rule 26(a)(3), pretrial "disclosures must be made at least 30 days before trial."  *Id.* R. 26(a)(3).  OCRA relies on this deadline, Pl.'s Resp. [203] at 13, but Rule 26(a)(3) also states that it applies "[u]nless the court orders otherwise."  This district orders otherwise.  Under Local Rule 26(a)(5), all disclosures must be supplemented "no . . . later than the discovery deadline established by the case management order."  *See Jagneaux v. United Rentals (N. Am.), Inc.*, No. 1:18-CV-186-LG-RHW, 2020 WL 1821256, at *4 (S.D. Miss. Apr. 10, 2020) ("In this District, a supplemental report is timely when provided no later than the discovery deadline.").  "If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

B.      Kroger's Motion to Strike McKay Affidavit

OCRA offered a supplemental affidavit from McKay to support the summary-judgment motion it filed on December 2, 2022, five months after the extended disclosure deadline.  *See* Order [198] at 6 n.1 (final extension noting May 18, 2022 deadline for written discovery and June 17, 2022 deadline for all other discovery).

Despite that delay, OCRA argues that Defendants cannot now complain because they deposed McKay before his original expert report was disclosed and agreed not to seek a second deposition.  That's factually correct, and the Court agrees that at least one "purpose of Rule 26(a)(2) is to provide notice to opposing counsel—before the deposition—as to what the expert witness will testify."  *Hill v. Koppers Indus.*, No. 3:03-CV-60-P-D, 2009 WL 3246630, at *2–3 (N.D. Miss. Sept. 30, 2009) (quoting *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir.

2008)).  But even if Kroger waived the right to re-depose McKay, it never waived the right to

receive "full and complete" disclosures within the Court's deadlines.  Fed. R. Civ. P. 37(c)(1).

OCRA also says McKay's affidavit "is within the scope of the initial expert report" such

that it was "properly submitted in conjunction with dispositive motions."  Pl.'s Resp. [203] at 14

(quoting *Cooper v. Meritor, Inc.*, No. 4:16-CV-52-DMB-JMV, 2019 WL 545187, at *6 (N.D.

Miss. Feb. 11, 2019)).  But comparing McKay's initial report with the opinions expressed in his

supplemental affidavit reveals new opinions.  McKay's initial report summarized these opinions:

> 1. It seems reasonable to assume that the original intent of the drainage plan for
> the properties was for the City drain to capture any flow that might otherwise
> cross from one property to the other.
>
> 2. It also appears very evident, from both field inspections and hydraulic
> calculations that during certain rain events, water is draining across the western
> property line of Old Canton Apartments, LTD from the adjacent property.
>
> 3. Factors which appear to be contributing to this condition include:
>
> > • Lack of extension past the northern inlet of the recently installed
> > concrete curbing,
> > • Inadequate open area and drastically undersized pipe leaving
> > southern inlet,
> > • Inlet grates not being cleaned off, and
> > • Inadequate number of inlets along the property line, one of which
> > may be currently covered up.

McKay Report [148-5] at 4.  Besides opining that the South Storm Inlet's outflow pipe is too

small, McKay also suggested that the inlet grate should "be bigger in size" to decrease the water

flowing from Defendants' property onto OCRA's land.  *Id.* at 18.  He also noted that "[i]f any

additional work has been completed on the shopping center property since the initial construction

that would introduce additional stormwater runoff volume or higher flows, this would reduce the

capacity of the original storm drain system's design."  *Id.* at 11 (bold typeface omitted).

McKay's supplemental affidavit restates his "professional opinion that the primary cause of the flooding is due to the undersized stormwater inlet on the east side of the Kroger Store." McKay Aff. [186-6] ¶ 12.  And then he adds these opinions:

13.  Additionally, over time, sediment has built up on Kroger's property which has resulted in a concentrated flow of water to flow onto Canton Road Manor from Kroger's property.

14.  More specifically, this sediment buildup and asphalt millings along the property line have created a berm over time, with a significant channel that funnels flash flood waters towards and onto the Canton Road Manor.

15.  There are several reasons that the sediment has continued to accumulate, and that excess water from Kroger's property continues to channel and inundate certain areas of the Canton Road Manor.

16.  First, at some point Kroger planted bushes along its side of the fence located between it and Canton Road Manor, including at the Central Storm Drain (inlet shown on original storm drainage map but not visible at times of inspection). Leaves fall from the bushes.

17.  The Central Storm Drain . . . appears to be below or immediately adjacent to one such bush.  The Central Storm Drain is completely covered and not visible upon visiting the site.[]

18.  Each time it rains, progressively more sediment/debris accumulates.  The water flow has become more concentrated to other areas that otherwise would flow into the Central Storm Drain and overpowers the Southern Storm Drain.

. . . .

21.  According to property maps, the Southern Storm Drain was installed on Kroger's property, not within the City's easement.[ ]

. . . .

23.  Commercial concrete parking blocks/barriers appear to have been picked up and moved from the 2018 asphalt paving project and never reinstalled.  These barriers are now located sporadically along the Kroger/Canton Road Manor property line.

24. My understanding is that these concrete parking barriers were discarded onto and along the fence line during Kroger's 2018 Major Renovation Project.

25.  The discarding of concrete barriers along the property fence line could worsen and hasten the channeling and sediment accumulation.

. . . .

27.  The sediment buildup and channeling that causes concentrated water to flood Canton Road Manor property was worsened when these concrete parking barriers were dumped along the fence line.

28.  Further, asphalt millings were left along the Kroger/Canton Road Manor property fence lines.

29.  Specifically, during Kroger's 2018 Major Renovation Project, asphalt was milled in order to resurface the loading zone between Kroger, on the east side[.]

30.  Any milling that was performed along the eastern edge of the asphalt pavement behind the shopping center could have definitely impacted the volume and direction of water during a flash flood event.

31.  Th[ese] asphalt millings that have piled up ha[ve] also contributed to the sediment/debris accumulation.

32.  Since my prior affidavit, I have also learned that, as part of Kroger's 2018 Major Renovation Project, a new groundwater drainage system was designed and constructed to divert the groundwater away from underneath the Kroger Store.

33.  Specifically, in 2018, Kroger allegedly installed a new French-drain type system underneath its entire cooler/freezer area.  Prior to that, the soil underneath the cooler/freezer area was so saturated with groundwater that the cooler/freezer was raised by an estimated 6", according to the construction company that designed and installed the new drainage system.

34.  This additional groundwater now being diverted into the City's storm water drainage system could be adding water volume to that storm water system.

35.  Moreover, at some point a trash dumpster was placed immediately next to the North Storm Drain, which contributes to debris covering the drain inlet.

36.  Further, a large grease pit along the fence line has not been emptied and remains full and has appeared to overflow.

37.  As asphalt, dirt debris, and other sediment accumulates along the fence line, and as additional water is diverted from under Kroger's building into the storm water drainage system, limiting its capacity, the channelized water from Kroger to Canton Road Manor worsens.

38.  Further, as Kroger sheds additional volumes of water through its newly installed groundwater drain—water that was not previous drained[—]the drainage system will necessarily lose capacity, which could contribute to water backing up and finding other exits—most notably onto the Canton Road Manor property.

39.  In summary, it appears evident that excessive amounts of water cross the western property line of Old Canton Apartment's, Ltd.'s property from Kroger's adjacent property (Jacksonian Plaza).  The primary cause of this concentrated water flow and flooding is due to the inadequately sized southern storm drain along with sediment accumulation due primarily [to] action[s] completed by Kroger such as installation of bushes, concrete barriers and asphalt millings that [were] dumped along the fence line in 2018, and dirt and debris that accumulates from Kroger's side of the fence line.

40.  Further, the new groundwater drainage system designed and constructed by Kroger adds to the water volume that Kroger is draining into the storm drainage system.  This could contribute to the overloading of the City's storm drainage system during flash flood events.

*Id.* at 2–6.

While there may be some overlap, these opinions go well "beyond opinions expressed in [McKay's] Rule 26 report[]."  *Bailey v. Stanley Access Techs., Inc.*, No. 3:14-CV-72-SA-JMV, 2015 WL 6828921, at *3 (N.D. Miss. Nov. 6, 2015) (noting that courts have stricken such supplemental reports).  For example, the initial report says nothing about a channel, sediment buildup including asphalt millings, relocated parking blocks, bushes, the new groundwater pump, the dumpster, or the grease pit.  "[I]t is not proper federal practice to assume that one can submit an incomplete expert report only to provide new opinions and/or new information" later.  *Hill*, 2009 WL 3246630, at *3.  The new opinions in the December 2, 2022 affidavit violate Rule 26.

OCRA next argues that even assuming the affidavit violates Rule 26, the violation is harmless:

When the court finds a violation of Rule 26, it looks to four factors to determine if the violation is harmless:  (1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose.

22

*Walker v. Benton Cnty.*, No. 3:20-CV-163-MPM-RP, 2022 WL 3273817, at *2 (N.D. Miss. July 8, 2022) (citing *Texas A&M Rsch. Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003)).

The parties seem to agree that McKay's testimony is important, but they disagree on the remaining factors.  Def.'s Mem. [200] at 7; Pl.'s Resp. [203] at 17.  Starting with prejudice, Kroger says it "would be prejudiced if . . . forced to re-depose . . . McKay based on his new opinions just months before the trial of this matter."  Def.'s Mem. [200] at 7–8.  That argument would normally have some bite, but Kroger deposed McKay before his report was finalized and expressly waived the right to re-depose him.  Kroger did, however, make another point during oral argument, noting that there is no time to consider and respond to McKay's new opinions.  OCRA makes a similar point when seeking to block Kroger's supplements.  *See* Pl.'s Mem. [237] at 8.

They're both right.  Allowing delinquent opinions would invite counter-designations and perhaps Rule 702 motions.  There is no time for that, but disallowing counter-designations would introduce surprises at trial (if the Court allowed the new opinions, it would necessarily allow opposing experts to address them).  Local Rule 26(a)(5) prevents those harms by setting a reasonable deadline for final opinions, and, here, the Court extended that deadline five times.  Granted, another continuance would address the prejudice and allow time to conduct another designation cycle.  But the trial date has already been pushed back more than a year, *see* Case Management Order [4], and neither side wants another continuance.

As to the final factor—excuse—OCRA says that "the McKay Affidavit was submitted after the discovery deadline due to the sole fact that the flooding events and the supplemental reports filed by Defendants all occurred and/or were produced after the discovery deadline."

Pl.'s Resp. [203] at 18.  That is, if "the McKay Affidavit contains 'new' opinions, those new opinions are based on information obtained from the August 30, 2022 site visit following a flood event and from the video and photographic evidence taken during the August 2022 flood events."  *Id.* at 16.  Even so, OCRA could have sought yet another extension or expeditiously supplemented (as Kroger did).  But none of the opinions listed above mention the August 2022 flood and instead primarily reference alterations that occurred in 2018.

In short, McKay signed his report on March 25, 2022, McKay Report [148-5] at 22, and had three months to timely supplement.  OCRA has offered no valid reason for missing that deadline, and "given the advanced stage of the litigation, permitting the new evidence would not . . . be[] harmless."  *CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 280 (5th Cir. 2009).  As stated in *Hill*, "it is not proper federal practice to assume that one can submit an incomplete expert report only to provide new opinions and/or new information [through an affidavit]. . . . [O]nly a timely filed supplemental report that comports with Rule 26(a)(2) can supplement an original expert report."  2009 WL 3246630, at *3.  Kroger's Motion to Strike [199] is granted; McKay's trial testimony must fall within the scope of his properly designated opinions.

B.     OCRA's Motion to Strike

OCRA notes that Kroger has now supplemented the expert reports from Gee Ogeltree and Jill Butler four times.  Ogeltree went first, supplementing on June 24, 2022.  *See* Def.'s Suppl. [184-2].  Butler supplemented on July 28, 2022, October 24, 2022, and April 21, 2023.  All four supplements came after the June 17, 2022 deadline, but OCRA let it go until moving to strike on April 28, 2023.  Kroger responded to that motion; OCRA never replied.  The motion is denied as to the first three supplements but granted as to the fourth.

1.      Ogeltree Addendum

Kroger designated Ogeltree on April 25, 2022, to discuss an easement between the properties.  After preparing his report, Ogeltree sought an affidavit from Dennis A. Cobb "to confirm '[t]he easements have not been amended or terminated' since at least 2003."  Def.'s Mem. [246] at 2.  When Cobb confirmed the point, Ogeltree supplemented his report by attaching Cobb's affidavit.  *See* Def.'s Suppl. [184-2].  He was seven days late, and Kroger never explains why.  On the other hand, the addendum merely confirms what Ogeltree had opined in his initial report, OCRA never factually disputes the opinion, and OCRA has not explained why the seven-day delay is prejudicial.  Indeed, OCRA accepted the supplement for more than a year before complaining.  The motion is denied as to Ogeltree.

2.      Butler's First and Second Addenda

Kroger designated Jill Butler on April 25, 2022.  On May 12, 2022, OCRA produced a report from engineer Charles Smithers, and six days later OCRA produced additional evidence.  Butler addressed those developments in a July 25, 2022 addendum to her report.  Def.'s Mem. [246] at 3–4.  The next month, a significant flooding event occurred, and Butler conducted another site visit.  *Id.* at 4.  By agreement, OCRA's counsel attended, and Butler quickly memorialized her findings in her second addendum on October 7, 2022.  *Id.*

Though delinquent, these supplements are harmless.  Butler's first two addenda address important information and are based on previously unavailable facts.  As for prejudice, OCRA says there is no time to depose Butler regarding her new opinions.  Pl.'s Mem. [237] at 6.  That may be true now, but OCRA sat on its hands for months before moving to strike the supplements.  A party may not manufacture prejudice through its own delay.  Nor can OCRA

25

claim surprise—it attended the inspection in August 2022 that generated the second addendum filed in October 2022.  Finally, a continuance is not an option, and neither party seeks one.

In sum, OCRA's motion to strike the first two Butler supplements is denied.  Kroger explained why it supplemented and the delays are harmless, especially because OCRA waited too long to object.

### 3.    Butler's Third Supplement

Butler's final supplement occurred one day before the pretrial conference and requires a closer look.  OCRA's most compelling argument notes that the information Butler addresses in her third supplement was available before her second supplement.  Kroger essentially concedes the point, arguing that her final supplement merely corrects a measurement and fine-tunes the way the August 2022 flooding event will be presented.  Def.'s Mem. [246] at 5.

According to Kroger, that's permissible because supplementation "means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure."  *Id.* (quoting *Diaz v. Con-Way Truckload, Inc.*, 279 F.R.D. 412, 421 (S.D. Tex. 2012)).  Kroger emphasizes that the information Butler utilized in her final report was unavailable before her "initial" report.  *Id.* at 7.  But it was available before her second supplement, a point *Diaz* does not address.  And even if considered a proper supplementation, Local Rule 26(a)(5) required supplementation "no . . . later than the discovery deadline established by the case management order."

Because the late filing was not justified, the question becomes whether it was harmless.  Looking again to those factors, the importance seems marginal given Kroger's claim that there are no new opinions, and Kroger has not offered a valid reason for the delay.  Nor will a continuance help as neither side wants one.  That leaves prejudice, and this time OCRA has a

point.  Kroger disclosed this new report one day before the pretrial conference, and about seven months after Butler gathered the information on which it is based.  Kroger says there is no prejudice because there are no new opinions and that the "new" information "merely validates" Butler's earlier opinions.  Maybe, but in fairness to OCRA, it should have time for its experts to review those claims and offer counter-designations if they disagree.

And that's the same point Kroger urged when opposing McKay's affidavit.  While the desire to perfect a party's case is understandable, the deadlines prevent delay and surprise.  The Court granted ample extensions, but the time has come to try the case the parties prepared.[2]

## IV.    Conclusion

The Court has considered all arguments.  Those not specifically addressed would not have changed the outcome.  For the reasons stated, Kroger's motions in limine [211, 213, 217] are granted in part and denied in part.  Its motions in limine [215, 219] are granted, as is its motion to strike [199].  OCRA's motion to strike [236] is granted in part.

**SO ORDERED AND ADJUDGED** this the 5th day of June, 2023.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE

---

[2] The Court is concerned about one thing.  Butler hopes to correct the measurements of a pipe, but Kroger does not adequately explain how relevant those measurements are to her opinions.  If significant, it could create an awkward moment at trial.  For example, if OCRA cross examines Butler about the initial error, she would probably say she caught the mistake but that OCRA moved to prevent her from correcting it, or that the Court prevented her from doing so.  The Court needs to hear from the parties on this issue.  If necessary, they may request a Zoom conference before trial.